Marilyn A. CUEVAS, Petitioner–Appellee,

v.

Odie WASHINGTON, Warden, Dixon Correctional Center, Respondent–Appellant.

No. 92–3090.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 30, 1993.*

Decided Sept. 23, 1994.

Rehearing and Suggestion for Rehearing In Banc Denied Nov. 30, 1994.

---

* This case was briefed separately but argued together with *Green v. Peters,* No. 92–2856 [36 F.3d 602]; *Carter v. DeTella,* No. 92–2978 [36 F.3d

Paul W. Schroeder, Charles E. Watson, II, Jones, Day, Reavis & Pogue, Martin S. Carlson, Office of the State Appellate Defender, Lawrence C. Marshall (argued), Northwestern University Legal Clinic, Michael Rachlis, Hedlund & Hanley, Chicago, IL, for petitioner-appellee.

Roland W. Burris, Steven J. Zick (argued), Office of the Atty. Gen., Criminal Appeals Div., Chicago, IL, for respondent-appellant.

Before FAIRCHILD, COFFEY and RIPPLE, Circuit Judges.

FAIRCHILD, Circuit Judge.

Petitioner-appellee Marilyn Cuevas ("Cuevas") was convicted of murder and attempted murder in Illinois state court following a jury trial. Cuevas challenges the murder conviction, contending that instructions given her jury violated her federal due process rights. She also argues that she should be resentenced with respect to attempted murder. Odie Washington, the Warden of the Dixon Correctional Center where Cuevas is incarcerated, appeals from a judgment of the district court granting Cuevas' petition for a writ of habeas corpus. 811 F.Supp. 1294.[1] We reverse.

# I. BACKGROUND

## A. Facts

Sally Evans ("Evans") met Hector Rivera ("Rivera") in 1980, began living with him in 1981, had a son by him, and married him in March 1984. Rivera moved out within the first month of marriage, but would come see Evans and her children about twice a week, and would telephone regularly. He also moved back in and then out again in April. When he was not living with Evans, he was living with Cuevas. At times, Evans would call Rivera at Cuevas' house.

Evans last saw Rivera on June 1, 1984, while at her mother's house. While there, Evans answered a phone call from Cuevas. Cuevas told her, "I know he's [referring to Rivera] there and let me talk to him. You are going to get it...." Tr. at 89. Cuevas testified that Evans also told her that "she was going to stab me. She was going to kill him. She had her gun ready." Id.

Victoria Rosario, Evans' cousin, was at Evans' mother's house when Cuevas called. Later that day, she received a phone call at her home from Cuevas. Cuevas asked for Evans, but Rosario said she was not there. Rosario testified that "[s]he said that she knows that Hector [Rivera] is with Sally [Evans] ... and that she's throwing all of Hector's stuff out the windows right now, his clothes, and that she said she was going to stab my cousin when she catches my cousin, and that Hector, she was going to kill him, too. That if she can't have him, nobody was going to have him." Id. at 122.

Juana Torres ("Torres") testified that on June 7, 1984, she went to a bar named La Zona Roja with Rivera around 11:00 p.m. There, they met Rivera's brother Miguel and talked with him. Cuevas, who was a waitress at the bar, was there, and asked Torres to follow her to the bathroom. In the bathroom, Cuevas asked Torres if she "had something going" with Rivera. Torres said they were just friends. Torres returned to the table where Rivera and Miguel were seated. About ten minutes later, Cuevas came to the

---

1385]; *Rosa v. Peters*, No. 92–3258 [36 F.3d 625]; and *Everette v. Roth*, No. 92–4063 [37 F.3d 257].

1. Because the Attorney General of Illinois represents Mr. Washington, we will refer to respondent-appellant as "the State."

table and called Torres a whore. Cuevas then pushed Torres to the floor, Torres got up and pushed back, and then Rivera made a fist aimed at Cuevas' face, but Torres did not see him actually hit Cuevas. They were then thrown out of the bar.

Torres testified further that she left the bar first. She started to walk home, and got about two or three blocks from La Zona Roja when she stopped at a bar to call her brother and the police. Cuevas and Rivera followed her in, and Cuevas would not let her call, so Torres left to go to the police station. Rivera and Cuevas followed behind her, talking. When Torres was near the police station, Cuevas again called her a whore. Rivera, in turn, said Cuevas was the whore. As Rivera started to walk, Torres heard a shot. Torres saw Cuevas with a gun; Rivera was walking towards Cuevas. Rivera grabbed his leg, and continued to walk towards Cuevas. Rivera then grabbed Cuevas' hands with the gun in them and pulled them upwards. Torres heard a shot. Rivera let Cuevas have the gun, and he walked towards Torres. The next thing Torres saw, Rivera was on the ground, and Cuevas had the gun in her hands and was pointing to Rivera, and Cuevas shot the gun. Cuevas started shooting at Torres, so Torres began walking in zig-zags until she reached the police station. Rivera died as a result of multiple gunshot wounds.

Shirley Jobe ("Jobe"), a Chicago police officer, testified that as she was leaving the police station just before midnight on June 7, she heard several shots. Cuevas approached her, with a gun dangling from her index finger. She handed Jobe the gun, saying in "almost a bragging manner," "here is the gun. I just shot him." *Id.* at 244, 246. She did not appear to be upset.

Assistant State's Attorney Lori Levin ("Levin"), after advising Cuevas of her *Miranda* rights, interviewed Cuevas at 4:25 a.m. with two detectives present. She initially discussed the matter with Cuevas, and then a court-reported statement was taken, with Levin asking Cuevas questions. That statement contains the following:

> Question: Did they [Rivera and Torres] leave the bar? Answer: Yeah.

Question: Did you leave the bar? Answer: Right behind them.

Question: Did you follow them? Answer: I followed them. I followed them to let her go, to let her fight with me, and there was a little alley like that crossing and I told her—I told Hector to let her go, let her fight with me. Look what you did to me. She's not a woman like me. She's a woman like me. Let her fight me.

Question: You said she's a woman like me. All I want to do is fight with her? Answer: Let me get at her, you know, and he was mad. He told me she's not going to fight with you and get out of here before I beat you up.

Question: What happened then? Answer: I told him—I told him if he hits me, I was going to get him for it.

Question: Were you still jealous? Answer: I was real angry.

Question: Then what happened? Answer: Then he kept on going with her. That's when I pulled out the gun, and I told him, I said, Hector. Then, he turned his face and looked.

Question: When you pulled out the gun, was Hector facing away from you? Answer: Yeah.

Question: Then what happened? Answer: He turned.

Question: Did he turn his whole body or just his face? Answer: No, he just turned his face.

Question: And then what did you do then? Answer: Then, I took a shot at his leg.

Question: Did you hit the back of his leg? ... Answer: Yes.

Question: And then what did you do then? Answer: Then, I took a shot at her, and then he just, like, grabbed me, you know, to try and get the gun off of me, and I gave two steps back. He was real close to me already.

Question: Then what did you do? Answer: I just shot and shot and shot.

Question: Did you then—then you just shot shot shot? Answer: Yeah.

Question: How many shots did you fire? Answer: Three more.

Question: Then what happened? Answer: Then, he went down, and I run after her.

*Id.* at 331–333.

Cuevas testified that she met Rivera in late 1983 when he was a customer at La Zona Roja. In mid-January 1984, he moved in with her. Beginning in mid-March, their relationship began to change. Rivera started to get upset by Cuevas' children (Cuevas had seven), and the two began fighting. Cuevas testified about three occasions when Rivera physically assaulted her; on one occasion, Rivera broke her nose. Rivera threatened at various times to beat Cuevas up and destroy her face. Cuevas told him a number of times to leave, but he didn't until June 1.

On the morning of June 1, Rivera came to Cuevas' apartment. Cuevas told him to take his things, but he refused to at that time. As he was leaving she threw a box of his things out the window. After he left, she threw all his things (except for books and weights) out the window.[2] That night, around midnight, he came to her house with the police, asking for his property. The next morning, he was outside her house in a car with some men; they did not speak.

The next day, Rivera kept calling, telling Cuevas he was going to get her for humiliating him. He also drove by her house with some men, and gestured by putting his fist into his open hand. He threatened to take her into an alley and have his friends rape her, then beat her up and destroy her face. Cuevas knew Rivera carried a switchblade.

On June 7, when Cuevas left work at 4:00 a.m., Rivera was outside with three or four friends. When Cuevas saw them, she quickly crossed the street, and a man she knew ("David") and her friend Carmen pulled up in a car and said they would take her home. When they reached Cuevas' apartment, Cuevas gave the apartment keys to Carmen so she could check if Rivera was in her apartment (Carmen was living with Cuevas at the time). Carmen did not look out the window to signal Cuevas in as planned. Cuevas, who had a knife, decided to go up to her apartment because her kids were there. David called her back to the car and gave her a gun, saying "don't shoot him, but protect yourself."[3] *Id.* at 515. Rivera was inside the apartment building's entrance, and he grabbed Cuevas as she came in the door. He dragged her up the stairs and began hitting her. When Rivera let go of one hand to hit her, Cuevas pulled the gun out, and Rivera went down the stairs. He started to come back up the stairs, saying, "you better use it, bitch"; she took a shot, and he ran out of the building. *Id.* at 517. Cuevas went into the apartment, and Carmen was sleeping.

Cuevas filed a complaint against Rivera, and he was arrested.[4] Later that night (June 7), she went to work. Around 10:00 p.m., Rivera's cousin Ruth came in; Cuevas told her she had Rivera locked up. Ruth suggested that Cuevas bail out Rivera, or else Rivera would be very angry. Cuevas then went with Ruth to Cuevas' apartment to get bail money, and the two went to the police station. When they arrived, they learned that Rivera had been released that morning.

Cuevas then returned to work, and Rivera and Torres were there, sitting at a table. At one point, Torres went to the bathroom, and Cuevas followed her. Cuevas asked Torres if she was with Rivera; Torres said that she was not with him, but was waiting for a friend. Cuevas told Torres that she knew

---

**2.** A woman who lived next to Cuevas testified that on June 1, she heard Rivera knock very hard on Cuevas' door, and say if he was not let in, he would knock in the door. Then she heard loud voices. She saw no clothes or boxes on the front lawn that day.

**3.** When interviewed by Detective Shak, a detective with the Chicago Police Department, on July 8, Cuevas said that David did not want to give her the gun but she took it from him. On cross-examination, Cuevas said that this was a lie.

**4.** In her interview with Detective Shak, Cuevas said that Rivera was arrested because he was shouting or threatening her outside La Roja Zona. She did not tell Shak that Rivera assaulted her at her apartment. Cuevas also did not tell Assistant State's Attorney Levin about Rivera hitting her at any time other than at La Roja Zona just prior to the shooting.

Rivera was there to hurt Cuevas, and that they should go somewhere else. Torres left first, and when Cuevas came out, Rivera came up to her and said "You better leave her alone. You better leave my girlfriend alone, ... 'cause I'm going to get you right here." *Id.* at 526. Cuevas got scared, and she returned to the bathroom.

Cuevas had the gun she had gotten from David with her, which she loaded in the bathroom. She asked a friend for a knife, but the friend did not have one. Later that evening, Cuevas was cleaning up a table next to where Rivera and Torres were sitting. They said things which upset Cuevas, so Cuevas pushed Torres. Rivera grabbed Cuevas and punched her in the eye, and kept hitting her. Rivera then held Cuevas, and Torres threw a broken glass at her. Cuevas bit Rivera on his arm, and he let her go. Rivera and Torres were held at the bar, and the bartender told Cuevas to leave. Cuevas then left with her friend Carmen.

As Cuevas tried to walk away, Rivera kept circling her. The two kept walking and fighting. Cuevas went into a bar, as did Rivera and Torres, and Cuevas went to the bathroom to look at her face. When she came out, Torres was on the phone, and Cuevas grabbed it from her. The three left the bar and began walking down the street. Rivera asked Torres if she wanted to fight Cuevas, and she said no. Then he said to Torres, "you go home. I am going to kill this bitch."[5] *Id.* at 541. He pushed Torres away, and Cuevas said, "No, you won't." *Id.* at 542. Cuevas took the gun out and shot Rivera in the leg. Rivera grabbed Cuevas' hands and picked her up by her hands. Cue-

vas fired two shots into the air. Rivera fell to the ground. Cuevas did not shoot him then. Torres began running, and Cuevas shot at her. Cuevas caught up with Torres, grabbed her hair, and Torres fell. Cuevas "took another shot but it was empty." *Id.* at 546. Torres then ran, and Cuevas walked until she came to Officer Jobe and gave her the gun. She told Jobe "Officer, I shot my boyfriend." *Id.* at 547.

Cuevas testified that she did not know that Rivera was married to or seeing Evans while he lived with Cuevas, although she did know that Rivera had fathered one of Evans' children.[6] Cuevas testified that she never called Evans or Rosario to ask about Rivera. She also denied threatening to kill Rivera or Evans.

### B. Jury Instructions

Cuevas' jury was given the then current Illinois Pattern Jury Instructions on murder and voluntary manslaughter based on an unreasonable belief of justification.[7] Ill. Pattern Jury Instructions, Criminal IPI, No. 7.02 ("Issues in Murder") and No. 7.06 ("Issues in Voluntary Manslaughter—Intentional—Belief of Justification") (2d ed. 1981). Cuevas' jury was also instructed on self-defense,[8] attempted murder and aggravated battery.

The murder instruction listed the elements of murder and told the jury that the State must prove them beyond a reasonable doubt. The voluntary manslaughter instruction listed the elements of voluntary manslaughter and told the jury that the State must prove them beyond a reasonable doubt. The ele-

**5.** Cuevas did not tell this to Assistant State's Attorney Levin.

**6.** Cuevas told Detective Shak that she threw Rivera out because of Evans. In her statement taken at the police station, Cuevas said that she kicked Rivera out of her apartment because he was seeing other women.

**7.** The Illinois statutes regarding murder and voluntary manslaughter were rewritten, effective July 1, 1987, to create the offenses of first degree murder and second degree murder.

**8.** Under the relevant section of the Illinois Code [a] person is justified in the use of force against another when and to the extent that he

reasonably believes that such conduct is necessary to defend himself or another against such other's imminent use of unlawful force. However, he is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another, or the commission of a forcible felony. Ill.Ann.Stat. ch. 38, para. 7–1. The Illinois Pattern Jury Instruction on self-defense follows the statutory language. Ill. Pattern Jury Instructions, Criminal IPI, No. 24–25.06 ("Use of Force in Defense of a Person") (2d ed. 1981).

ments of voluntary manslaughter include all the elements of murder (except for murder while committing an offense), and also include the element (in Cuevas' case) that defendant acted under an unreasonable belief that circumstances existed which would have justified the killing (sometimes referred to as "mitigating" because, in a sense, it is a defense to murder).[9] The jury was not told that it could not convict of murder unless the State disproved the mitigating element beyond a reasonable doubt.

These instructions are the same as those considered in *People v. Reddick,* 123 Ill.2d 184, 122 Ill.Dec. 1, 526 N.E.2d 141 (1988), and *Falconer v. Lane,* 905 F.2d 1129, 1136 (7th Cir.1990), except that in those cases the jury was also instructed on voluntary manslaughter based on serious provocation; that instruction placed the burden on the State to prove that the defendant acted under a sudden and intense passion resulting from serious provocation by another.

In *Reddick,* the Illinois Supreme Court held that when these murder and voluntary manslaughter instructions are given without warning the jury that it could not convict of murder unless the State disproved the mitigating elements, they "erroneously state the burdens of proof on the issues of whether the defendants acted under either intense passions or unreasonable beliefs that their actions were justified." 122 Ill.Dec. at 5, 526 N.E.2d at 145. "These instructions essentially assure that, if the jury follows them, the jury cannot possibly convict a defendant of voluntary manslaughter. The reason is that even if a mitigating mental state is proved, it will have been proved by the defendant, not the People." *Id.* The court concluded that "grave error" had occurred. *Id.* 122 Ill.Dec. at 7, 526 N.E.2d at 147.[10]

Subsequently, this court held that when the same instructions are given, they violate federal due process because a jury may have

been left with the false impression that it could convict of murder even if there was a mitigating mental state. *Falconer,* 905 F.2d at 1136; *see also Verdin v. O'Leary,* 972 F.2d 1467, 1470 (7th Cir.1992); *Flowers v. Ill. Dep't of Corrections,* 962 F.2d 703, 705 (7th Cir.1992), *vacated on other grounds,* —— U.S. ——, 113 S.Ct. 2954, 125 L.Ed.2d 656 (1993), *on remand,* 5 F.3d 1021 (1993); *Taylor v. Gilmore,* 954 F.2d 441, 450 (7th Cir.1992), *rev'd on other grounds,* —— U.S. ——, 113 S.Ct. 2112, 124 L.Ed.2d 306 (1993), *on remand,* 4 F.3d 997 (1993) (Table); *United States ex rel. Fleming v. Huch,* 924 F.2d 679, 682 (7th Cir.1991); *Rose v. Lane,* 910 F.2d 400, 402 (7th Cir.), *cert. denied,* 498 U.S. 983, 111 S.Ct. 515, 112 L.Ed.2d 526 (1990).

### C. Procedural History

The jury found Cuevas guilty of the murder of Rivera and guilty of attempted murder of Torres. Cuevas raised a number of issues on direct appeal. In an unpublished decision, the Illinois Appellate Court found that while the instructions were error under *Reddick,* the error was harmless because there was "not enough evidence to allow the jury to consider the manslaughter instruction." Mar. 27, 1990 Order at 8. It also found Cuevas' challenge to her sentence for attempted murder to be moot. The Illinois Supreme Court denied Cuevas' petition for leave to appeal.

Subsequently, Cuevas filed a petition for a writ of habeas corpus in federal district court. The district court granted Cuevas' petition on the instructional error, concluding that the error was not harmless beyond a reasonable doubt because "Cuevas has advanced a colorable claim of an unreasonable belief of justification." May 15, 1992 Mem. Op. and Order at 8. The district court denied Cuevas' petition with respect to the sentencing issue. After Cuevas filed a motion to amend judgment, the district court vacated her attempted murder sentence and

9. Under the relevant section of the Illinois Code [a] person who intentionally or knowingly kills an individual commits voluntary manslaughter if at the time of the killing he believes the circumstances to be such that, if they existed, would justify or exonerate the killing under the principles stated in Article 7 of this

Code [Justifiable Use of Force; Exoneration] [footnote omitted], but his belief is unreasonable.
Ill.Ann.Stat. ch. 38, para. 9–2(b).

10. The Illinois Pattern Jury Instructions were rewritten to conform to *Reddick.*

remanded to the Illinois Circuit Court for resentencing. The State now appeals.

## II. DISCUSSION

### A. Fair Presentment

In *United States ex rel. Spurlark v. Wolff,* 699 F.2d 354 (7th Cir.1983), this court held that a state prisoner seeking habeas relief is barred from raising a claim he had failed to raise on a state court appeal, unless he can show cause and prejudice. *See Murray v. Carrier,* 477 U.S. 478, 489–490, 106 S.Ct. 2639, 2646–47, 91 L.Ed.2d 397 (1986). A petitioner's claim "must have been presented in such a way as to fairly alert the state court to any applicable [federal] constitutional grounds for the claim." *United States ex rel. Sullivan v. Fairman,* 731 F.2d 450, 453 (7th Cir.1984).[11]

Earlier, in the context of exhaustion of state remedies, the Supreme Court had said that "the federal claim must be fairly presented to the state courts." *Picard v. Connor,* 404 U.S. 270, 275, 92 S.Ct. 509, 512, 30 L.Ed.2d 438 (1971). "[W]e do not imply that respondent could have raised ... [his federal constitutional] claim only by citing 'book and verse on the federal constitution.' ... [citations omitted] We simply hold that the substance of a federal habeas corpus claim must first be presented to the state courts." *Id.* at 278, 92 S.Ct. at 513.

11. In *Sullivan,* this court concluded that petitioner waived his right to submit his due process claim in federal court because he did not present his due process argument to the state courts in the context of a federal constitutional claim, he never used the language "due process," he relied on state cases which refer only to the "interests of justice," and the state appellate court opinion indicated that it discerned no due process implications.

For a list of factors to consider in determining whether a petitioner has fairly presented a federal claim, *see Sullivan* at 454 (including n. 9).

12. In *Falconer v. Lane,* this court had implied that a petitioner's citation to *Reddick* may constitute a federal constitutional challenge to the Illinois jury instructions, noting that in *Reddick,* "the Court obviously considered the errors resulting from the invalid instructions to be of constitutional magnitude." *Falconer,* 905 F.2d at 1134. The petitioner in *Falconer* did argue to

In *Taylor v. Gilmore,* decided after *Falconer,* this court ruled that *Reddick* was grounded only in state law, with no ties to federal due process; "[a]ny indications to the contrary in our prior decisions are disavowed."[12] 954 F.2d at 449.

In *Verdin v. O'Leary,* a habeas petitioner claimed that the Illinois Pattern Jury Instructions violated the Due Process Clause because they had led "the jury to ignore constitutionally relevant, exculpatory evidence." 972 F.2d 1467, 1477 (7th Cir.1992). In state court he had not expressly claimed a violation of due process, but had argued that a refused instruction was necessary for the jury to understand the difference between murder and voluntary manslaughter. He only cited to state cases, none of which refer to the Due Process Clause or cite cases referring to the Due Process Clause. The State likewise did not refer to the Due Process Clause, and the appellate court did not reference constitutional grounds. This court concluded that there had been no fair presentment of his federal claim, and remanded to the district court to determine whether the petitioner's waiver of his federal claim could be excused under the "cause and prejudice" test or whether failure to consider his federal claim would result in a fundamental miscarriage of justice. *Id.* at 1483.

On direct appeal, in a supplemental brief to the Illinois Appellate Court,[13] Cuevas argued that the instructions were error under *Reddick.*[14] The appellate court only refer-

the Illinois Supreme Court that the instructions deprived her of "due process." The panel in *Falconer* noted that even if the petitioner's claim was interpreted as brought under the Illinois Constitution's Due Process Clause, such a claim would be "functionally identical to a federal claim," and therefore her federal claim was fairly presented. *Id.*

Additionally, in *Rose v. Lane,* a panel of this court stated that "*Reddick* creates a federal claim through *In re Winship* [397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970)]...." *Rose,* 910 F.2d at 401 n. 1.

13. *Reddick* was decided after Cuevas' opening brief to the Illinois Appellate Court.

14. In her supplemental reply brief, Cuevas did cite a United States Supreme Court case in support of her argument that *Reddick* should be applied retroactively to her case. This, however,

enced state law in its discussion of the *Red-dick* error and harmless error. In her petition for leave to appeal to the Illinois Supreme Court, Cuevas argued that the lower court erred in applying a harmless error analysis to the *Reddick* issue, citing only Illinois law.

Cuevas argues that the State waived the fair presentment argument. The State does not respond in its reply brief. It does assert in its initial brief that it was "not at liberty to raise this claim" until *Verdin,* which was decided after the district court ruled on Cuevas' petition, because citing to *Reddick* was sufficient to preserve a federal claim for habeas review pursuant to *Falconer v. Lane* (*see* n. 15). We note that the state did make a presentment argument in *Verdin.* Additionally, in *Taylor v. Gilmore,* this court ruled that *Reddick* was grounded only in state law, with no ties to federal due process. *Taylor,* 954 F.2d at 449 (7th Cir. Jan. 21, 1992). *Taylor* was decided almost three months before the State filed its answer to Cuevas' petition.

We need not, however, determine whether Cuevas adequately presented her federal claim on direct appeal or whether the State waived its presentment argument, given the following discussion.

### B. Harmless Error

 Cuevas would like us to read *Falconer* broadly, as holding that when these murder and voluntary manslaughter instructions are given without alerting the jury to the need to determine whether the mitigating circumstance of an unreasonable belief of justification was present, and if present not to convict of murder, and the jury convicts of

murder, there is always a denial of federal due process, and never harmless error, no matter how slight the evidence of an unreasonable belief of justification.[15]

Several considerations militate against so broad a reading. First, the court in *Falconer* spoke in terms of a possibility that a jury would improperly convict of murder, and suggested that there was substantial evidence that the defendant, who attempted to prove that she killed in self-defense, did have a mitigating mental state:

> The central point is that the jury *might* have decided to convict the petitioner of murder because the State proved that she intentionally killed another without a reasonable belief that she acted in self-defense—*despite clear proof* that the petitioner was provoked to murderous passion by the victim or that the petitioner held an unreasonable belief that she was justified in killing the victim.

*Falconer,* 905 F.2d at 1136 (emphasis added).

Additionally, even though in several cases we have noted the "inherently prejudicial" nature of the instructions,[16] all subsequent decisions of this court which have found *Falconer*-type denials of due process have considered whether the error was harmless and have evaluated the evidence in order to determine that it was not. *See Flowers v. Ill. Dep't of Corrections,* 962 F.2d at 705 ("Our review of the record confirms the state trial judge's apparent belief, given that he tendered a voluntary manslaughter instruction to the jury, that the evidence presented at trial could support either a voluntary manslaughter verdict or a murder verdict. Consequently, we conclude that the error at Flowers' trial was not harmless beyond a

is immaterial to whether Cuevas presented her claim that the instructions violated her federal due process rights.

**15.** In *Falconer,* a panel of this court concluded that "[a]s the Eighth Circuit stated in finding constitutionally faulty jury instructions: 'Such error [a jury verdict based on an instruction that allows it to convict without properly finding the facts supporting each element of the crime] is not corrected merely because an appellate court, upon review, is satisfied that the jury would have found the essential facts had it been properly instructed. The error cannot be treated as harm-

less.'" 905 F.2d at 1137 (citing *United States v. Voss,* 787 F.2d 393, 398 (8th Cir.) *cert. denied,* 479 U.S. 888, 107 S.Ct. 286, 93 L.Ed.2d 261 (1986)).

**16.** *Rose v. Lane,* 910 F.2d at 402–403 (noting that *Falconer* found the instructions to be "gravely erroneous" and "inherently prejudicial"); *United States ex rel. Fleming v. Huch,* 924 F.2d at 683 (recognizing that *Falconer* and *Rose* found that the error was "inherently prejudicial"); *Taylor v. Gilmore,* 954 F.2d at 454 (recognizing that *Falconer,* *Rose* and *Fleming* found the instructions were "inherently prejudicial").

reasonable doubt ...," *id.* at 706); *Taylor v. Gilmore,* 954 F.2d at 450 (considering "whether the erroneous jury instructions ... were harmless beyond a reasonable doubt," *id.* at 454) ("Our review of the record confirms the trial judge's belief ["that there was enough evidence in the record to support mitigation to manslaughter"] ...," *id.*) (noting that "[h]ad there been insufficient evidence in that regard, the judge would not have been obligated to [give the manslaughter instruction] ...," *id.*); *United States ex rel. Fleming v. Huch,* 924 F.2d 679 ("A closer question than whether the jury instructions violated due process is whether that constitutional violation was harmless beyond a reasonable doubt," *id.* at 683) (concluding that because there was "substantial and uncontroverted" evidence of battered wife syndrome, which was basis for self-defense theory, the instructional error was not harmless, *id.*); *Rose v. Lane,* 910 F.2d at 402 ("we must decide ... whether the trial court's constitutional error was harmless," *id.* at 403) (concluding that because there was evidence that the defendant believed he was acting in self-defense, a jury might not have convicted him of murder if properly instructed, *id.*). Thus, we have interpreted *Falconer* as permitting consideration of whether *Falconer*-type errors were harmless in light of the evidence before the jury.

■ Finally, the Supreme Court has decided that "the *Kotteakos* harmless-error standard applies in determining whether habeas relief must be granted because of constitutional error of the trial type." *Brecht v. Abrahamson,* — U.S. —, —, 113 S.Ct. 1710, 1722, 123 L.Ed.2d 353 (1993).[17] There must be more than "a " 'reasonable possibility' " that trial error contributed to the verdict"; habeas petitioners are entitled to ha-

beas relief based on trial error only if the error resulted in "actual prejudice." *Id.* at — - —, 113 S.Ct. at 1721–1722. The question is whether the error " 'had substantial and injurious effect or influence in determining the jury's verdict.' " *Id.* at —, 113 S.Ct. at 1722 (quoting *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946)).

In the present case, we have Cuevas' testimony that she had been abused in the past and recently assaulted and threatened by Rivera. Just before the shooting incident, Rivera told Torres, "you go home. I am going to kill this bitch." In addition, Cuevas testified that she never called Evans or Rosario while looking for Rivera, let alone told them she was going to kill Rivera.

On the other hand, we have Evans' and Rosario's testimony that Cuevas told each of them on the phone that she was going to kill Rivera. There were indications that Cuevas was jealous of Rivera seeing other women. Torres testified that Cuevas instigated the fight at La Zona Roja, and that Cuevas shot Rivera while he was on the ground. In Cuevas' statement, she said that she initially shot Rivera when his body was turned away from her. She also told Rivera she wanted to fight Torres, and chased Torres and tried to shoot her after she shot Rivera. Cuevas did not tell Detective Shak or the Assistant State's Attorney that Rivera had assaulted her on previous occasions, including the assault at Cuevas' apartment less than one day before the shooting incident.

■ There are indeed some questions of credibility in deciding the correct version of the facts. We do note that the jury must have found Cuevas' version incredible in

---

17. While the issue in *Brecht* was whether a habeas petitioner was entitled to relief because the state improperly used his post-*Miranda* silence for impeachment purposes, the harmless error standard announced in *Brecht* applies to instructional error. *See Libby v. Duval,* 19 F.3d 733, 739–740 (1st Cir.1994), *cert. denied,* — U.S. —, 115 S.Ct. 314, — L.Ed.2d — (1994); *Kontakis v. Beyer,* 19 F.3d 110, 116 (3d Cir.1994), *cert. denied,* — U.S. —, 115 S.Ct. 215, — L.Ed.2d — (1994); *O'Neal v. Morris,* 3 F.3d 143, 145–147 (6th Cir.1993), *cert. granted in part,* — U.S. —, 114 S.Ct. 1396, 128 L.Ed.2d

70 (1994) (question presented: "Does state have burden of proving constitutional error to be harmless under *Brecht v. Abrahamson?*" 62 U.S.L.W. 3680). *But see Suniga v. Bunnell,* 998 F.2d 664, 667 (9th Cir.1993).

Prior to *Brecht,* the harmless error standard was whether federal constitutional error "was harmless beyond a reasonable doubt." *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). We apply *Brecht* here. *See Lockhart v. Fretwell,* — U.S. —, —, 113 S.Ct. 838, 844, 122 L.Ed.2d 180 (1993).

large part because it rejected the claim that she acted in self-defense. Insofar as possible the habeas or appellate court shuns resolving credibility and weighing the evidence. Nevertheless, the *Brecht–Kotteakos* test for harmless error requires the habeas court to evaluate to some extent the probability of the outcome if the case were tried under proper instructions.

The constitutional error perceived in *Falconer* was that "the jury may have been left with the false impression that it could convict the petitioner of murder even if she possessed one of the mitigating states of mind described in the voluntary manslaughter instruction" and that "[j]urors are therefore encouraged by the structure of the instructions to answer ... [the requirements of the murder instruction] first and then move on only if those requirements cannot be met." *Falconer,* 905 F.2d at 1136.

 The *Falconer* error is present here. We conclude, however, that the error did not have a "substantial and injurious effect or influence in determining the jury's verdict" and therefore was harmless.[18]

In rejecting Cuevas' claim of self-defense as justification, the jury must have found that she did not reasonably believe that shooting Rivera was necessary to defend herself. If in fact the jury did not credit Cuevas' testimony which might tend to show she had such a belief, though unreasonable, the error had no effect on the verdict. Assuming, however, that the instruction caused the jury to believe that it could convict of murder even if Cuevas had such belief, or without considering whether she did, our review of the trial transcript satisfies us that the jury was not and would not have been persuaded that Cuevas had such belief.

### C. Attempted Murder Sentence

In her brief to the Illinois Appellate Court, Cuevas stated that "if one of the convictions falls, the sentence given will be based upon a factor no longer in existence—the murder conviction. This Court must therefore va-

cate both sentences even if it only vacates one conviction."[19] Cuevas' Appellate Br. at 48. The Illinois Appellate Court found the issue moot because it affirmed both Cuevas' murder and attempted murder convictions.

Cuevas did not challenge the attempted murder sentence in her petition for leave to appeal to the Illinois Supreme Court. In her memorandum in support of her petition for a writ of habeas corpus, Cuevas argued that because the murder conviction was improperly obtained due to the instructional error, and because the trial court relied on that conviction by considering it an aggravating factor, her right to be sentenced on the basis of accurate information was violated.

In its initial decision, the district court found that Cuevas had procedurally defaulted on her sentencing claim, and failed to show cause and prejudice for the default. May 15, 1992 Mem.Op. and Order at 8–9. Cuevas filed a motion to amend, asserting that the sentencing issue was only collateral to her instructional challenge, and she therefore was not allowed to raise it in her petition for leave to appeal. The district court granted the motion to amend, reasoning that "resentencing follows as a necessary remedy for the due process violation stemming from the improper jury instructions used at her trial." July 31, 1992 Mem.Op. and Order at 2.

 We do not agree with the district court's change of heart. Because Cuevas did not raise her sentencing claim to the Illinois Supreme Court, and, as the district court initially ruled, she did not show cause for or prejudice from her failure, she is not entitled to federal habeas relief on this claim. *See United States ex rel. Bonner v. DeRobertis,* 798 F.2d 1062, 1065–1066 (7th Cir.1986).

Regardless, because we reverse the district court's judgment which granted Cuevas' petition with respect to the instructional error, the sentencing issue is moot.

Accordingly, the judgment of the district court is REVERSED.

---

18. The Illinois Appellate Court also found that the instructional error was harmless.

19. The trial judge stated "I impose the sentence of 27 years.... And that sentence will be concurrent with both murder and the attempt murder, to run together." Tr. at 776–777.

RIPPLE, Circuit Judge, dissenting.

Without resolving definitively whether the federal issue was presented adequately, the majority determines that the district court erred in granting habeas relief to the petitioner because the constitutional error committed in the rendition of the instructions was harmless. I agree with my colleagues' suggestion that the state has waived the argument that the federal issue was not fairly presented to the state courts. Therefore, the district court appropriately addressed the merits of the petitioner's constitutional claim. However, because I do not believe that the instructional error can be deemed harmless, I cannot join my colleagues in reversing the judgment of the district court. In my view, the conclusion that the error is harmless is based on an impermissible substitution of their judgment on a factual matter for that of the state court jury. I do not believe that it is the proper role for a federal habeas court to intrude so drastically into the prerogative of the jury.

At the outset, it must be stressed that the analysis that follows presupposes the continued vitality of *Falconer v. Lane,* 905 F.2d 1129 (7th Cir.1990), in this circuit despite the Supreme Court's critique of that decision in *Gilmore v. Taylor,* —— U.S. ——, 113 S.Ct. 2112, 124 L.Ed.2d 306 (1993). Until that matter is raised and briefed in plenary fashion, *Falconer* remains the law of the circuit and we must proceed accordingly.

In *Falconer,* a panel of this court held that the Illinois pattern murder instructions, earlier invalidated on state law grounds by the Illinois Supreme Court in *People v. Reddick,* 123 Ill.2d 184, 122 Ill.Dec. 1, 526 N.E.2d 141 (1988), also violated the Due Process Clause of the Fourteenth Amendment. The federal infirmity identified by this court in *Falconer* therefore was different from the state ground relied upon by the state court in *Reddick.* In *Reddick,* the Supreme Court of Illinois had taken the view that, as a matter of state law, the instructions should have placed on the government the burden of disproving beyond a reasonable doubt a mitigating mental state. By contrast, this court acknowledged that, as a matter of federal

constitutional law, the burden of proof with respect to an affirmative defense may be placed on either party.[1] It held, however, that the pattern instructions were infirm because, although the murder instructions preceded the voluntary manslaughter instructions, they did not explicitly tell the jury that it could not return a murder verdict if it found that the defendant possessed a mitigating mental state. It was possible, concluded the court, for a jury to find that a defendant was guilty of murder without ever considering whether he was entitled to the voluntary manslaughter conviction. Explicit misdirection on this scale, concluded the court, violates the Due Process Clause. In reaching this conclusion, the court relied principally on the Supreme Court's holding in *Cupp v. Naughten,* 414 U.S. 141, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973). In that case, the Court had held that federal courts may not overturn a state conviction on the ground that the jury instructions were erroneous unless those instructions can be said to have infected the entire trial. *Id.* at 147, 94 S.Ct. at 400.

The issue before us today is whether the error identified in *Falconer* can be considered harmless. If it can be so considered, we must determine the applicable standard in making such a determination. In *Brecht v. Abrahamson,* —— U.S. ——, ——, 113 S.Ct. 1710, 1717, 123 L.Ed.2d 353 (1993), the Supreme Court, through the pen of the Chief Justice, held that "trial error" ought to be evaluated on habeas review under the standard enunciated earlier in *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). "Trial error," the Chief Justice wrote, " 'occurs during the presentation of the case to the jury.' " *Id.* —— U.S. at ——, 113 S.Ct. at 1717 (quoting *Arizona v. Fulminante,* 499 U.S. 279, 307, 111 S.Ct. 1246, 1263, 113 L.Ed.2d 302 (1991)). It is susceptible to harmless error analysis because it may be quantitatively assessed in the context of the other evidence that is presented at trial. *Id.* As the Supreme Court set forth in *Brecht,* under this standard, a reviewing court must determine whether the error " 'had substantial and injurious effect

---

1. *See Patterson v. New York,* 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977).

or influence in determining the jury's verdict.'" *Brecht,* —— U.S. at ——, 113 S.Ct. at 1722 (quoting *Kotteakos,* 328 U.S. at 776, 66 S.Ct. at 1253). "At the other end of the spectrum," continued the Chief Justice, are structural defects in the trial mechanism that "infect the entire trial process," *id.* —— U.S. at ——, 113 S.Ct. at 1717, and therefore require automatic reversal. "Trial error" usually involves the admissibility of evidence or the propriety of the argument of counsel. Here, however, we deal with another form of error that arises in the course of trial—instructional error. It is well established at this point that instructional error must be assessed quite differently from other errors that arise in the course of trial. Some are "structural" in nature and not at all subject to harmless error analysis. *See Sullivan v. Louisiana,* —— U.S. ——, ——, 113 S.Ct. 2078, 2082, 124 L.Ed.2d 182 (1993) (holding that a constitutionally deficient reasonable-doubt instruction cannot be harmless error). On the other hand, other instructions that misstate the task of the jury in assessing the evidence before it are subject to harmless error analysis. *See Carella v. California,* 491 U.S. 263, 266–67, 109 S.Ct. 2419, 2421–22, 105 L.Ed.2d 218 (1989) (holding that an instruction that a rental car kept 5 days past the rental agreement "shall be presumed to have been embezzled" impermissibly shifts the burden of proof, but is subject to harmless error analysis); *Rose v. Clark,* 478 U.S. 570, 582, 106 S.Ct. 3101, 3108, 92 L.Ed.2d 460 (1986) (holding that an instruction that impermissibly shifts the burden of proof on the issue of malice in a murder prosecution is subject to harmless error analysis); *Sandstrom v. Montana,* 442 U.S. 510, 526–27, 99 S.Ct. 2450, 2460–61, 61 L.Ed.2d 39 (1979) (holding that constitutionally erroneous instruction establishing conclusive presumption that perpetrator intends the ordinary consequences of voluntary acts is subject to harmless error analysis). These cases make clear that, as the majority holds, *Falconer* error is subject to harmless error analysis. However, as I shall detail in the paragraphs that follow, application of the harmless error rule in these cases poses problems, both conceptual and practical, not faced when we deal

with other types of error that arise in the course of trial.

As in the case of instructions that establish mandatory presumptions or instructions that shift the burden of proof, it is indeed difficult to assess the effect of an instruction such as that at issue in *Falconer* and the present case that explicitly skews the jury's decision-making process so that it might not even consider the mitigating circumstances that would result in acquittal of the principal charge and conviction only on the lesser included offense. When the traditional formulation of the harmless error test of *Kotteakos* is applied uncritically to instructional error of the type presented by *Falconer,* the contours of harmless error analysis are radically expanded. Federal habeas courts consequently are placed in the position of supplying missing factual findings of the jury and, indeed, of relying on evidence to uphold the conviction that the jury may not have considered. *See Libby v. Duval,* 19 F.3d 733, 741 (1st Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 314, —— L.Ed.2d —— (1994) (Stahl, J., dissenting).

In the case of the usual forms of trial-type error such as erroneously admitted evidence or improper argument to the jury, the sort of quantitative assessment contemplated by *Brecht* is easily accomplished by the reviewing court. The court has before it the entire record and can easily determine whether the fact established by the erroneously admitted evidence was nevertheless established to an overwhelming degree by other lawfully admitted evidence; a judgment therefore can be made as to whether the erroneously admitted evidence had a substantial and erroneous influence on the jury's verdict. Such an approach is far more difficult when the appellate court is called upon not to assess the effect of information that the jury had before it but to assess the effect of the jury's not having considered relevant information or not having made a finding which the law requires it to make.

As I have already noted, it is clear from the established precedent that the difficulty in applying the standard *Kotteakos* approach does not mean that these instructional errors ought not be evaluated under a harmless error analysis. Nor does it mean that the

holding of *Brecht* ought to be inapplicable in such instances. It simply means that an analytical approach, tailored more precisely to the nature of the particular error on the fairness of the proceedings, must be found. As Judge Stahl of the First Circuit has pointed out in his dissenting opinion in *Libby*, Justice Scalia's concurring opinion in *Carella v. California*, 491 U.S. 263, 267–73, 109 S.Ct. 2419, 2421–24, 105 L.Ed.2d 218 (1989), offers a formulation that is of considerable help in this situation.[2] Because the inquiry is not whether guilt can be established from the record, but whether guilt was ever found properly by the jury, a reviewing court must determine that the instruction that could have misdirected the jury's efforts in such a drastic way did not play a role in its verdict. *Carella*, 491 U.S. at 270, 109 S.Ct. at 2423 (Scalia, J., concurring). Under this approach, instructional error that so grossly misdirects the jury's inquiry is harmless when it can be established that the facts that the jury necessarily found pursuant to other correct instructions are so closely related to the fact to be proved by the erroneous instruction that a rational jury could not have found the former facts without also finding the fact addressed by the erroneous instruction. In the case of an impermissible presumption, for example, the predicate acts established by correct instructions may so conclusively establish the requisite intent that no rational jury could conclude that the defendant committed the criminal act in question, but did not have the intent that was also the subject of the impermissible presumption. *See Carella*, 491 U.S. at 272, 109 S.Ct. at 2424 (discussing *Rose*, 478 U.S. at 579, 106 S.Ct. at 3106). In cases such as the one before us, in which the jury's inquiry was affirmatively skewed so that the jury might find the defendant guilty of murder without even considering the lesser included offense of manslaughter, the error might also be harmless when the evidence before the court simply did not permit a finding of manslaughter.

While the course of this circuit's approach to harmless error in the *Falconer* situation has perhaps not been a seamless garment, our cases, read as a whole, do recognize these principles. As the majority suggests, our cases do contain language that, taken alone, suggests that *Falconer* error can never be harmless. Notably, however, each of these cases did explore the possibility that the evidence of record might not reasonably raise the lesser included offense of manslaughter. *See Taylor v. Gilmore*, 954 F.2d 441, 454 (7th Cir.1992), *rev'd on other grounds*, —— U.S. ——, 113 S.Ct. 2112, 124 L.Ed.2d 306 (1993) (noting that the error was "inherently prejudicial," but also examining the record to determine that the lesser included offense was raised by the evidence); *Fleming v. Huch*, 924 F.2d 679, 683 (7th Cir.1991) (same); *Rose v. Lane*, 910 F.2d 400, 403 (7th Cir.), *cert. denied*, 498 U.S. 983, 111 S.Ct. 515, 112 L.Ed.2d 526 (1990) (same). A later case makes no such reference to the impossibility of harmless error but, notably, approaches the harmless error analysis by asking whether the lesser included offense was reasonably raised by the evidence. *See Flowers v. Illinois Dep't of Corrections*, 962 F.2d 703, 706 (7th Cir.1992), *vacated on other grounds*, —— U.S. ——, 113 S.Ct. 2954, 125 L.Ed.2d 656 (1993). Our present Chief Judge followed a similar analysis when, writing for the court in *United States v. Kerley*, 838 F.2d 932 (7th Cir.1988), he held that the district court's error in not instructing the jury with respect to one element of the offense was harmless because the element was "not contestable." *Id.* at 939.

The foregoing approach may well result in a determination of harmless error in substantially fewer instances than in the usual "trial error" situation. However, this difference in result is due to the difference in the problem presented. The Supreme Court has acknowledged that all errors cannot be neatly classified as either "structural" or "trial" errors. In *Brecht*, the Chief Justice, referring to Justice White's earlier observation in *Ful-*

---

2. Justice Scalia was addressing in *Carella* an erroneous instruction that created a conclusive presumption. He noted, however, that his analy-

sis is applicable to other situations where the jury has been deprived of its fact-finding role. *Carella*, 491 U.S. at 270, 109 S.Ct. at 2423.

*minante,*[3] noted that "structural" and "trial" errors were at opposite ends of the "*spectrum*" of constitutional errors. *Brecht,* —— U.S. at ——, 113 S.Ct. at 1717 (emphasis added). Explicit misdirection to the jury on its responsibility to consider the evidence tending to support acquittal on the principal charge and conviction on the lesser included offense is an error very different from the admission of tainted evidence. That it must be treated differently by a reviewing court ought not be surprising.

Justice Scalia's approach to error of this sort was formulated prior to *Brecht.* It is clear, however, that his analysis is not dependent upon a particular formulation of the standard of review. The Justice's opinion is an explanation of the particular dangers presented by instructions that deprive the jury of its fact-finding role—an explanation that makes clear that such an alteration in the jury's function cannot easily be neutralized because it is far closer to a "structural" error than the typical trial-type error. Certainly, allowing the approach urged by Justice Scalia in *Carella* to survive *Brecht* is compatible with the principles of judicial restraint and federalism re-emphasized in that opinion. As Judge Stahl points out, fact-finding by federal judges on habeas review is hardly evidence of judicial restraint. Nor is it required by a healthy concept of federalism. Federal courts are to respect the factual findings of the state courts,[4] not supplement them.

It is indeed a close question as to whether the evidence of record justifies an instruction on the mitigating factor of unreasonable belief that the circumstances justified killing. In my view, the district court and my colleagues on this panel are correct in concluding that the instruction ought to have been given—a view that was shared by the state trial judge who saw the witnesses and evaluated the evidence. Assuming the correctness of that assessment, we must determine whether the giving of the instruction in the form condemned by *Falconer* is harmless error. As the majority quite frankly admits, reliance on the harmless error doctrine in this case requires the judges of this court to perform a task that the jury may never have addressed because of the erroneous jury instructions. It requires that the panel resolve matters of credibility and weigh the evidence on the primary issue of guilt or innocence. Ms. Cuevas has a right to have her guilt or innocence determined by a jury, not by federal appellate judges. Accordingly, I respectfully dissent.

---

**3.** *Arizona v. Fulminante,* 499 U.S. 279, 290–91, 111 S.Ct. 1246, 1254–55, 113 L.Ed.2d 302 (1991) (White, J., dissenting in part).

**4.** *See Sumner v. Mata,* 455 U.S. 591, 598, 102 S.Ct. 1303, 1307, 71 L.Ed.2d 480 (1982) (per curiam) (holding that federal courts owe deference to the findings of fact of state courts on habeas review).