For the reasons given in my separate opinion in *Thomas v. Peters*, 48 F.3d 1000 (7th Cir.1995), I concur in the judgment.

**Vincent THOMAS, Petitioner–Appellee,**

**v.**

**Howard A. PETERS, III, Director, Department of Corrections, State of Illinois, Respondent–Appellant.**

**No. 93–2725.**

United States Court of Appeals, Seventh Circuit.

Argued Nov. 8, 1994.

Decided Feb. 23, 1995.

Stephanie L. Ellbogen (argued), Office of the Cook County Public Defender, Chicago, IL, for petitioner-appellee.

Bradley P. Halloran (argued), Rita M. Novak, Office of the Atty. Gen., Chicago, IL, for respondent-appellant.

Before COFFIN,* CUMMINGS, and EASTERBROOK, Circuit Judges.

COFFIN, Circuit Judge.

This case and its companion [1] require us to consider whether *Gilmore. v. Taylor,* — U.S. ——, 113 S.Ct. 2112, 124 L.Ed.2d 306 (1993), impliedly overrules our earlier decision that the old Illinois Pattern Jury Instructions for murder and manslaughter, when given together, deprive a criminal defendant of due process of law. *See Falconer v. Lane,* 905 F.2d 1129 (7th Cir.1990). We are not persuaded that it does. Nevertheless, because we conclude that the error was harmless in Thomas's case, we reverse the judgment below granting him habeas corpus relief.

## I. *Background*

### A. *Facts*

On April 11, 1986, Vincent Thomas shot and killed James Jones. At Thomas's murder trial, the prosecution portrayed the shooting as deliberate retaliation by Thomas for having been beaten up by Jones the night before. Thomas claimed the shooting was self-defense.

The prosecution called two eyewitnesses. Felbert Morris testified that, on the morning of April 11, he agreed to get a beer with Thomas. The two men drove off in Morris's car, Thomas directing Morris to travel in a different route than he originally intended. The car soon approached James Jones and Eric Archie, neither of whom Morris knew. Thomas told Morris to stop the car and he got out. He approached the two men, and, referring to a fight among them the previous night, said something to the effect of "what are you going to do now?" Further words were exchanged, but Morris could not hear them. Morris then saw Thomas throw a punch at Archie and heard a gunshot. He looked at Thomas and saw a gun in his hand.

After the first shot, Jones and Archie ran off in different directions. Morris testified that, as they were fleeing, he saw Thomas fire two shots at one of the men, turn, and fire one shot at the other man. One of these bullets struck Jones in the middle of his back, punctured his heart, and killed him. After getting back into Morris's car, Thomas explained that he shot at the men because they had "tied him up and put him in [a] trunk" the night before. Morris testified that he never saw Jones or Archie hold or fire a weapon of any kind.

The prosecution's second eyewitness was Eric Archie. Archie testified that, on the evening before the shooting, Thomas and Jones had engaged in an extended fist fight, during which Jones apparently beat Thomas quite badly, and that Archie repeatedly intervened to break up the fighting. The next morning, while he and Jones stood in front of Jones's car, he saw Thomas drive up in Morris's car, exit the passenger side door, and approach them. Archie testified that Jones asked Thomas, "You come back to finish the fight?" and that Thomas replied, "No, I['ve] come back to kill you." After this exchange, Thomas pulled out a gun and held it at his side. Thomas swung at Archie with it, who ducked and avoided the blow. Archie then heard a shot from the gun, which Thomas was pointing downward. He saw Jones begin to run and he fled in the opposite direction, realizing that he had been shot in the foot. He testified that, while fleeing, he heard two more shots being fired. He also testified that neither he nor Jones held any weapons or threatened Thomas's life on that morning or during the fight the night before.

The prosecution also called Officer Wronka, who arrived on the scene shortly after Jones was shot, and Detective Flood, who arrived sometime thereafter. They both testified that they searched the area and found no guns or weapons.

Thomas took the stand in his own defense and described a vastly different version of events. Like Archie, he testified that he and Jones had fought at a liquor store the night before the shooting. But, according to him,

---

* The Honorable Frank M. Coffin of the First Circuit is sitting by designation.

1. *Toney v. Peters,* 48 F.3d 993 (7th Cir.1995).

he arrived at the store and left with Morris, directly contradicting testimony by Morris and Archie that Morris had not been present. Thomas testified that during the initial fight Jones punched him and Archie struck him on his head with a gun. Thomas further testified that, on the morning of the shooting, while he and Morris were driving to the store to get beer, they again happened upon Archie and Jones by chance. Thomas told Morris to pull over because he wanted to ask the two men why they had beaten him. According to Thomas, Morris then handed him a gun and told him, "if I was you, I would take this gun." Thomas took the gun, got out of the car, and approached the two men. Archie said to him "Oh, you back?" and then pulled something out of his pocket and swung at Thomas. When Archie swung at him, Thomas fell against a car. His gun, which he said he removed from his pocket as he fell, discharged and accidentally hit Archie in the foot. He testified both that the firing was accidental and that, at the time, he believed Archie was trying to hurt him. After the gun he held went off, he said he heard "five, maybe six shots" coming from Jones's direction. Fearing that Jones was attempting to kill him, he turned and fired three shots toward Jones. He then got back in Morris's car and the two left the scene.

The defense also called Helen Walker, who lived near the alley where the shootings took place. She testified that she heard "just about five" gunshots that morning. On cross examination, she admitted that she previously had told the prosecutor that she heard more than three shots, but that she could not be certain whether there were four or five shots.

Thus, except for Thomas, everyone who saw or heard the incident—prosecution witnesses Morris and Archie and defense witness Walker—all testified that they heard at least three and at most five gunshots. Thomas testified that, including the shots

that Jones fired allegedly causing him to fear for his life, nine or ten shots were fired.

### B. Jury Instructions

The jury was charged on the counts of murder and voluntary manslaughter according to the Illinois Pattern Jury Instructions then in force.[2] The jury was instructed that, to convict for murder, it had to find three elements proved beyond a reasonable doubt: first, that Thomas performed the acts that caused Jones's death; second, that when he performed those acts, he intended to kill or do great bodily harm to Jones;[3] and third, that he was not justified in using the force that he used. The jury was instructed that a person is justified in using force that is intended or likely to cause death or great bodily harm only if he reasonably believes it necessary to prevent imminent death or great bodily harm to himself or another.

The jury also was charged on both the "unreasonable belief" and "serious provocation" forms of manslaughter. To convict on unreasonable belief manslaughter, the jury had to find four elements proved beyond a reasonable doubt: first, that Thomas performed the acts that caused Jones's death; second, that when he performed those acts, he intended to kill or do great bodily harm to Jones; third, that when he performed those acts, he believed that circumstances existed that would have justified killing Jones; and fourth, that his belief that such circumstances existed was unreasonable. To convict on serious provocation manslaughter, the jury had to find three elements proved beyond a reasonable doubt: first, that Thomas performed the acts that caused Jones's death; second, that when he performed those acts, he intended to kill or do great bodily harm to Jones; and third, that when he did so he acted under a sudden and intense passion resulting from serious provocation by Jones.

Finally, the jury was told: "The defendant is charged with the offenses of murder and

---

2. Illinois's murder and voluntary manslaughter statutes were revised, effective July 1, 1987, to create the offenses of first and second degree murder.

3. The intent to kill element, as it appears in the murder charge and both voluntary manslaughter charges, is also satisfied if he knew his acts would cause or create the strong probability of causing death or great bodily harm to Jones.

manslaughter for which you will receive three verdict forms. You are to sign only one of these forms." In other words, the jury could not convict for both murder and manslaughter; it could choose only one.

## C. Procedural History

The jury found Thomas guilty of murder and he appealed. One year after his conviction, the Illinois Supreme Court held that the same instructions given in his case were erroneous as a matter of state law. *People v. Reddick,* 123 Ill.2d 184, 122 Ill.Dec. 1, 526 N.E.2d 141 (1988). The Illinois Supreme Court took petitioner's case as part of a consolidated appeal to determine the retroactive applicability of its *Reddick* decision. In *People v. Shields,* 143 Ill.2d 435, 443–44, 453–54, 159 Ill.Dec. 40, 44, 48–49, 575 N.E.2d 538, 542, 546–47 (1991), it decided that *Reddick* should apply retroactively because the instructions may violate a defendant's due process right to a fair trial, but that the error was harmless in Thomas's case. Thomas then petitioned the United States District Court for a writ of habeas corpus. Following this court's decision in *Falconer v. Lane,* which also found that the instructions effect a denial of due process, and finding that the error could not be considered harmless, the district court granted habeas corpus relief. *United States ex rel. Vincent Thomas v. Peters,* No. 92 C–6958, slip op. at 5–7, 1993 WL 141709 (N.D.Ill. April 30, 1993). The State of Illinois now challenges this judgment.

## II. Discussion

On appeal, the State argues that the Supreme Court's decision in *Gilmore v. Taylor* "effectively eviscerates" this court's ruling in *Falconer.* Alternatively, it urges that the error was harmless in Thomas's case. Before addressing these claims, we review why this court previously has found these instructions defective.

The linchpin of the problems that flow from these instructions is the failure to inform the jury that a finding of guilt on the manslaughter charge must result in an acquittal on the murder charge. Of particular concern is that the murder charge precedes the manslaughter charge, leading the jury to evaluate whether the evidence supports a murder conviction without ever considering whether the defendant acted under an unreasonable belief or from serious provocation, and thus is guilty only of manslaughter. This court's first decision finding a due process violation explained that the instructions may give a jury

> the false impression that it could convict the petitioner of murder even if she possessed one of the mitigating states of mind described in the voluntary manslaughter instruction.... The murder instruction, in other words, read as though voluntary manslaughter did not exist as a crime.

*Falconer v. Lane,* 905 F.2d at 1136. A subsequent decision said that the instructions "worked an affirmative injustice; they allowed—even invited—the jury to return a verdict of guilty on the murder charge even if it made findings that should have resulted in a verdict of manslaughter." *United States ex rel. Fleming v. Huch,* 924 F.2d 679, 681 (7th Cir.1991). Later, this court described the error as the instructions' inherent ambiguity, allowing a jury to convict for murder "without considering evidence that would warrant mitigation to voluntary manslaughter." *Taylor v. Gilmore,* 954 F.2d 441, 452–53 (7th Cir.1992). In sum, these decisions essentially characterized the error as possibly depriving defendants of the benefit of the affirmative defense of manslaughter and, in so doing, resulting in murder convictions that, under Illinois law, should have been manslaughter convictions.

## A. The Supreme Court's Decision

In *Taylor v. Gilmore,* this court held that *Falconer* should apply retroactively. The Supreme Court reversed. Applying the test articulated in *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), it held that *Falconer* announced a "new rule" and would not be given retroactive effect. *Gilmore v. Taylor,* —— U.S. at ——, 113 S.Ct. at 2119. The State would have us read *Gilmore* as also holding that the instructional error here was one of state law only, unreviewable by a federal habeas court. We are reluctant, however, not to take the Supreme

Court at its word. The Court repeatedly made plain that "[t]he retroactivity of *Falconer* under *Teague* and its progeny *is the only question before us in this case.*" *Gilmore,* ⎯ U.S. at ⎯, 113 S.Ct. at 2116 (emphasis added). The Court explicitly recognized the State's argument that the error was one wholly of state law and stated that it "need not address this contention." *Id.* ⎯ U.S. at ⎯, 113 S.Ct. at 2117.[4]

Instead, to determine if *Falconer* announced a new rule with prospective effect only, the Court analyzed whether it was "*'dictated* by precedent existing at the time the defendant's conviction became final.'" *Id.* ⎯ U.S. at ⎯, 113 S.Ct. at 2116 (quoting *Teague,* 489 U.S. at 301, 109 S.Ct. at 1070) (internal quotation omitted). Applying this stringent test, it found no such precedent. *See id.* ⎯ U.S. at ⎯⎯⎯, 113 S.Ct. at 2117–19. For example, the cases recognizing that due process requires the prosecution to prove each element of the charged crime beyond a reasonable doubt, but allows states to place upon defendants the burden of proving affirmative defenses, *see Martin v. Ohio,* 480 U.S. 228, 233, 107 S.Ct. 1098, 1101–02, 94 L.Ed.2d 267 (1987); *Patterson v. New York,* 432 U.S. 197, 210, 97 S.Ct. 2319, 2327, 53 L.Ed.2d 281 (1977); *In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 1072–73, 25 L.Ed.2d 368 (1970), convinced the Court that "the result reached in *Falconer*" was "not compel[led]" by precedent. *Id.* ⎯ U.S. at ⎯, 113 S.Ct. at 2117.[5] In short, the Court refrained from deciding a question of law and confined itself to deciding whether the answer to that question was "foreordained." *Id.* ⎯ U.S. at ⎯, 113 S.Ct. at 2119.

It is true, as Justice O'Connor indicated in her concurrence, that the Court's decision can be misread as holding that the error identified by *Falconer* did not constitute a violation of due process. It is also true that one can point to statements suggesting justices' then existing attitude on the merits. But the issue on the merits was neither presented nor decided. Only a few months ago the Court invoked what Justice Scalia called its "customary refusal to be bound by dicta." *U.S. Bancorp Mortgage Co. v. Bonner Mall Partnership,* ⎯ U.S. ⎯, ⎯, 115 S.Ct. 386, 391, 130 L.Ed.2d 233 (1994). As the instant case illustrates, there is good reason for this practice. Because neither the litigants nor the Court focused on the question of whether a due process violation was committed, the nature of the instructional defect was not explored at length. Indeed, the Court's opinion described the error most briefly—as "preventing the jury from considering evidence of [defendant's] affirmative defense." *Gilmore,* ⎯ U.S. at ⎯, 113 S.Ct. at 2118. The other justices' opinions described the error in the same way. *Id.* ⎯ U.S. at ⎯, 113 S.Ct. at 2122 (O'Connor, J., concurring); *id.* ⎯ U.S. at ⎯, 113 S.Ct. at 2126 (Blackmun, J., dissenting).

Because the State suggests that, even if *Gilmore* did not expressly overrule *Falconer,* it shows that *Falconer* was wrongly decided, we have endeavored to revisit the instructions at issue to evaluate anew their effect upon a jury. That review has led us to look at prior concerns in a different way and has made even clearer the nature and gravity of the inherent error. As discussed below, in addition to the flaws already recognized, these instructions have the effect of imposing

4. Any doubts about whether the majority went further than it said are also dispelled by both the concurrence and the dissent filed in the case. Justice O'Connor, joined by Justice White, concurred specifically to prevent the misreading of the majority opinion that the State urges upon us. *Id.,* ⎯ U.S. at ⎯, 113 S.Ct. at 2123 ("I do not join the Court's opinion ... because it could be read (wrongly, in my view) as suggesting that the Court of Appeals' decision in this case applied not only a new rule, but also an incorrect one."). Justice Blackmun, joined by Justice Stevens, began his dissenting opinion by criticizing the majority for failing to reach the issue of whether the instructions violate due process.

5. The *Falconer* error, of course, does more than place upon a defendant the burden of proving the affirmative defense of manslaughter; it may deprive a defendant of this affirmative defense entirely. *See Falconer,* 905 F.2d at 1136 ("No matter which side carried the burden of proof on any particular element or defense,.... the jury could nevertheless return a murder verdict...."); *see also Gilmore,* ⎯ U.S. at ⎯, 113 S.Ct. at 2122 (petitioner's contention "does not concern the allocation of burdens of proof; he argues that the jury did not consider his defense at all") (O'Connor, J., concurring).

on the jury a purely arbitrary decision between a verdict of murder and one of manslaughter. Since this defect had not been identified, the *Gilmore* Court could not have passed upon its constitutionality. We therefore decline the invitation to extrapolate *Gilmore* to compel the overruling of *Falconer.*

## B. The Constitutional Violation

To understand how these instructions force jurors into an arbitrary decision between murder and manslaughter, one must recall how these crimes are defined and that the jury is never instructed that a finding of guilt on the manslaughter charge precludes a finding of guilt on the murder charge. An intentional killing with an unreasonable subjective belief in justification is manslaughter; under these instructions, however, it is simultaneously and necessarily also murder because it is also an intentional killing without justification, that is, without an objectively reasonable belief that the use of force is necessary. Additionally, when a killing is driven by a sudden and intense passion resulting from serious provocation—and thus is manslaughter—it is also carried out without justification—and thus is murder. In other words, under these instructions, it is logically impossible to commit manslaughter without thereby committing murder.[6]

These instructions, then, do more than possibly deprive a defendant of the benefit of the affirmative defense of manslaughter; they do more than cause murder convictions that, had state law been applied correctly, should have been manslaughter convictions only. They place a jury that has determined that the defendant killed based on an unreasonable but honestly held belief or from serious provocation in an impossible situation. The jury has been instructed that it may convict for manslaughter alone, or murder alone, but not both. Yet under these instructions the defendant must be found guilty of manslaughter and, at the same time, he must be found guilty of murder. There exists *no* basis in fact or law for a jury to decide which verdict to return; indeed, logically the decision cannot be made. Such a scheme makes a jury's decision whether to convict for murder or manslaughter purely arbitrary, or worse, driven by impermissible considerations such as the defendant's race, decision to testify in his own defense, prior convictions, or other such irrelevant factors. Seen in this light, the error profoundly corrupts " 'the central purpose of a criminal trial . . . to decide the factual question of the defendant's guilt or innocence.' " *Arizona v. Fulminante,* 499 U.S. 279, 308, 111 S.Ct. 1246, 1264, 113 L.Ed.2d 302 (1991) (quoting *Delaware v. Van Arsdall,* 475 U.S. 673, 681, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1986)).

The salient question is whether placing a jury in a position where it is forced to decide between murder and manslaughter on a purely arbitrary or otherwise impermissible basis raises " 'a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the constitution." *Estelle v. McGuire,* 502 U.S. 62, 72, 112 S.Ct. 475, 482, 116 L.Ed.2d 385 (1991) (quoting *Boyde v. California,* 494 U.S. 370, 380, 110 S.Ct. 1190, 1197–98, 108 L.Ed.2d 316 (1990)). Even outside the criminal context, where special protections apply, purely arbitrary deprivations of liberty or property have been held to run afoul of due process.[7]

---

**6.** The opposite is not true: the instructions still make it possible to commit murder without committing manslaughter.

**7.** *See Honda Motor Co., Ltd. v. Oberg,* —— U.S. ——, ——–——, 114 S.Ct. 2331, 2339–42, 129 L.Ed.2d 336 (1994) (arbitrary punitive damages awards violate due process; the "whole purpose" of the Due Process Clause is to prevent "arbitrary deprivations of liberty or property"); *Superintendent, Massachusetts Correctional Institute, Walpole v. Hill,* 472 U.S. 445, 454–55, 105 S.Ct. 2768, 2773–74, 86 L.Ed.2d 356 (1985) (arbitrary revocation of prisoners' accumulated "good time" credits violates minimum requirements of due process). Here, the "amount" of arbitrarily deprived liberty is great: at the relevant time, manslaughter was punishable by a sentence of between four and fifteen years; murder was punishable by a sentence of between twenty and forty years. *See* Ill.Rev.Stat., ch. 38, ¶¶ 9–2(c), 1005–8–1(1) and (4) (1985). "Indeed, when viewed in terms of the potential difference in restrictions of personal liberty attendant to each conviction, the distinction . . . between murder and manslaughter may be of greater importance than the difference between guilt or innocence for many lesser crimes." *Mullaney v. Wilbur,* 421 U.S. 684, 698, 95 S.Ct. 1881, 1889, 44 L.Ed.2d 508 (1975).

■ We believe that, by forcing the jury to make the grave decision between murder and manslaughter on the basis of lot or bias, these instructions violate the right to a fair trial protected by the Fourteenth Amendment's Due Process Clause and the Sixth Amendment right to trial by jury. *See Weiss v. United States,* —— U.S. ——, ——, 114 S.Ct. 752, 761, 127 L.Ed.2d 1 (1994) ("It is elementary that 'a fair trial in a fair tribunal is a basic requirement of due process.'") (quoting *In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955)); *Morgan v. Illinois,* 504 U.S. 719, ——, 112 S.Ct. 2222, 2228, 119 L.Ed.2d 492 (1992) ("'[T]he right to a jury trial guarantees to the criminally accused a fair trial ...'") (quoting *Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961)).[8] We cannot, at this juncture, predict that the Supreme Court would disagree.

Nor can we accept our concurring brother's reading of our opinion as a "renunciation" of *Falconer.* As we observe in note 5, *supra* at 8, the *Falconer* error goes beyond burden shifting to a complete removal of an affirmative defense—something that neither *Martin v. Ohio* nor *Patterson v. New York* went so far as to uphold. The *Falconer* court's conclusion that such a situation violates due process remains viable.

Moreover, the concurrence, viewing the additional problem we identify differently than we do, marshals arguments relevant only to its view. The constitutional defect is not the mere chance that jurors might be influenced by impermissible factors, or that they will disregard "distasteful" jury instructions, or that the instructions are "too clear." Rather, the problem, in our view, is that jurors faced with a defendant who has committed manslaughter are placed in a Catch–22: they must convict for both murder and manslaughter, yet, they must convict for only murder or manslaughter; they must distinguish between murder and manslaughter, yet, the manslaughterer is equally a murderer. Unable to comply with such contradictory instructions, their verdicts cannot but be arbitrary. Accordingly, Court precedents upholding prosecutorial discretion and jurors' discretion to exercise mercy in capital cases, or construing two criminal statutes to be mutually exclusive, do not, in our view, reach this problem.

### C. *Harmless Error*

■ As several recent decisions make clear, the instructional error here is subject to harmless error analysis despite earlier statements that it is "inherently prejudicial." *See Green v. Peters,* 36 F.3d 602, 607–08 (7th Cir.1994); *Cuevas v. Washington,* 36 F.3d 612, 619–21 (7th Cir.1994); *Rosa v. Peters,* 36 F.3d 625, 630–32 (7th Cir.1994); *Carter v. DeTella,* 36 F.3d 1385, 1391–93 (7th Cir. 1994). The test is "whether, in light of the record as a whole," the error "'had substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht v. Abrahamson,* —— U.S. ——, ——, 113 S.Ct. 1710, 1722, 123 L.Ed.2d 353 (1993) (quoting *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946)); *Carter,* 36 F.3d at 1392. Furthermore, this Circuit has held that applying the *Brecht* test "requires the habeas court to evaluate to some extent the probability of the outcome if the case were tried under proper instructions," an inquiry that may indeed touch upon questions of witness credibility. *Cuevas,* 36 F.3d at 620–21; *Rosa,* 36 F.3d at 632; *Carter,* 36 F.3d at 1392.[9] As guided by these

---

8. The purpose of the Sixth Amendment right to trial by jury is "to make available the common-sense judgment of the community" as a hedge against "the exercise of arbitrary power," *Taylor v. Louisiana,* 419 U.S. 522, 530, 95 S.Ct. 692, 697–98, 42 L.Ed.2d 690 (1975), goals we think are defeated by these instructions.

9. The Supreme Court recently discussed harmless error analysis in *Sullivan v. Louisiana,* —— U.S. ——, ——, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993). In that case, the Court held that defective reasonable doubt instructions are not susceptible to harmless error analysis and thus always invalidate a criminal conviction. In so holding, the Court explained its reasoning in a way that might be applicable to harmless error analysis beyond the context of defective reasonable doubt instructions. The Court stated that the harmless error inquiry "is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered." Such an inquiry is forbidden "because to hypothesize a guilty verdict that was never in fact rendered—no matter how inescapable the findings to support the verdict might be—would violate the

principles, our review of Thomas's trial transcript satisfies us that the error was harmless in his case.

According to Thomas's version of events, he shot at Jones only to protect himself from the bullets Jones was firing at him. Indeed, he testified that he saw Jones firing "a black gun" at him and "s[aw] the bullets [and] heard the bullets pass my ear." Had the jury believed this, it should have acquitted Thomas because he would have been acting in self defense.[10] The jury did not. Based on its verdict, the jury must have found Thomas's story incredible. We can readily understand this decision: Jones's purported weapon was never found; Jones was shot squarely in the back, despite Thomas's testimony that he fired at Jones while Jones was firing at him; and all three witnesses, other than Thomas, testified to three, four or five shots being fired, rather than the nine or ten that would have been fired according to Thomas's account.

The only way the jury should have convicted for manslaughter—and therefore the only way the error was prejudicial to Thomas— was if it found that he actually believed that Jones was firing at him or that he was acting out of a sudden and intense passion caused by Jones's serious provocation. It seems clear to us that, in rejecting his testimony that Jones was actually firing at him, the jury made a determination that left little or no room for such a finding of mitigating mental state. Moreover, we find the evidence overwhelming that Jones never had a gun that morning, and that Thomas shot Jones in revenge for the previous night's beating.[11] Thus, to the extent that a manslaughter verdict remained a logical possibility in light of the jury's rejection of Thomas's story, it seems sufficiently unlikely to us that we find the instructional defect in this case harmless.

Indeed, prior decisions of this Circuit have found harmless error despite evidence supporting manslaughter of at least comparable weight to that presented here. *See Cuevas*, 36 F.3d at 620–21 (defendant testified that man she killed had physically abused her in the past and had recently assaulted her and explicitly threatened her life); *Rosa*, 36 F.3d at 627–28, 631–32 (defendant gave statement that he and a friend were approached by a group of men from hostile gang; he fired weapon that killed victim only after he heard someone shout, "Get them," and heard gunshots); *Carter*, 36 F.3d at 1391–93 (defendant testified that victim had swung a baseball bat at him, trying to kill him; defendant then wrestled the bat away and hit victim with it). Further, we note that a majority of the Supreme Court of Illinois found that the error in Thomas's case was harmless *beyond a reasonable doubt*. *Shields*, 143 Ill.2d at 453–54, 159 Ill.Dec. at 49, 575 N.E.2d at 547. Faced with *Brecht's* less stringent standard, and this Circuit's decisions applying harmless error in this area, we conclude that the instructional defect does not require issuance of the writ in this case.

Accordingly, the judgment below is RE-VERSED.

[Sixth Amendment] jury-trial guarantee." Instead, the inquiry is "whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error." *Id.* —— U.S. at ——, 113 S.Ct. at 2081–82.

The Court thus adopted the harmless error analysis urged by Justice Scalia in *Carella v. California*, 491 U.S. 263, 267, 109 S.Ct. 2419, 2421–22, 105 L.Ed.2d 218 (1989) (per curiam) (Scalia, J., concurring), whereby error is deemed harmless if untainted fact findings by the jury are so closely related to the facts found via the defective instruction that no rational juror could find one without the other. *See Sullivan*, —— U.S. at ——, 113 S.Ct. at 2082; *Carella*, 491 U.S. at 271, 109 S.Ct. at 2423–24. *See also United States v. Parmelee*, 42 F.3d 387 (7th Cir.1994) (applying *Sullivan* harmless error test to instruction that was missing required element). Because this approach was explicitly urged by Judge Ripple in several recently decided cases applying harmless error analysis to the *Falconer* error, *see Green, Cuevas, Rosa, Carter, supra*, but was rejected by the majority of that panel, we do not apply that analysis here.

10. There is nothing in the instructional defect that would have led the jury not to acquit had self defense been established.

11. As noted, Archie testified that Jones asked Thomas if he had come back to finish their fight, to which Thomas replied, "No, I'[ve] come back to kill you." Morris testified that Thomas told him he shot Jones in retaliation for the previous night's events.

EASTERBROOK, Circuit Judge, concurring.

The principal question before us is not "whether *Gilmore v. Taylor*, — U.S. —, 113 S.Ct. 2112, 124 L.Ed.2d 306 (1993), impliedly overrules our earlier decision that the old Illinois Pattern Jury Instructions for murder and manslaughter, when given together, deprive a criminal defendant of due process of law." Majority opinion at 1001. *Taylor* formally reserves that issue. We must decide, not whether *Taylor* has taken the subject out of our hands, but whether our earlier decision is right. The Court's analysis in *Taylor* demonstrates that *Falconer v. Lane*, 905 F.2d 1129 (7th Cir.1990), is incorrect. We should say so rather than prop it up with yet another rationale.

*Falconer* used the Constitution to redress what the Supreme Court of Illinois held in *People v. Reddick*, 123 Ill.2d 184, 122 Ill.Dec. 1, 526 N.E.2d 141 (1988), to be a mistaken application of Illinois law. Federal courts lack authority to employ 28 U.S.C. § 2254 to enforce state law, see *Estelle v. McGuire*, 502 U.S. 62, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991), and our court soon abandoned *Falconer's* original justification, replacing it with the view that the Illinois pattern jury instructions were too vague to lead to a reliable decision. *Taylor v. Gilmore*, 954 F.2d 441, 448–50 (7th Cir.1992), reversed, — U.S. —, 113 S.Ct. 2112, 124 L.Ed.2d 306 (1993). See also *Flowers v. Illinois Department of Corrections*, 962 F.2d 703, 705 (7th Cir.1992), vacated, — U.S. —, 113 S.Ct. 2954, 125 L.Ed.2d 656 (1993).

Just as *Taylor* threw over the rationale of *Falconer*, my colleagues renounce the rationale of *Taylor*. The panel in *Taylor* believed that the instructions are too vague, leaving jurors at sea. The Justices were distinctly unimpressed. Today's majority writes that a review "has led us to look at prior concerns in a different way" (majority op. at 1004). Now the instructions are too clear! They make it plain that if the defendant is guilty of manslaughter as Illinois defines that offense he is guilty of murder as well. I agree with this reading of the instructions. See *Flowers*, 962 F.2d at 709–10 (concurring opinion). The majority believes that they place "in an impossible situation" (opinion at 1005) a juror who believes that the defendant has killed another person but should not be branded a murderer. This hypothetical juror wants to acquit of murder but under the instructions can't. According to the majority, "[s]uch a scheme makes a jury's decision whether to convict for murder or manslaughter purely arbitrary, or worse, driven by impermissible considerations such as the defendant's race, decision to testify in his own defense, prior convictions, or other such irrelevant factors." *Id.* at 1005–06. In other words, the instructions are so explicit that they leave the jurors with no choice: if the defendant intentionally killed another person with an unjustified application of force, he is guilty of murder. Some jurors will find that outcome unpalatable, disregard the instructions, and decide on the basis of irrelevant or repugnant criteria.

Something must be wrong when the very precision of an instruction precludes its application. The possibility that jurors will disregard their instructions is not news. Jury nullification has not previously been thought to render instructions unconstitutional. Imagine what would happen if Illinois abolished self-defense as a mitigating factor, as *Patterson v. New York*, 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977), and *Martin v. Ohio*, 480 U.S. 228, 107 S.Ct. 1098, 94 L.Ed.2d 267 (1987), say it may do. Then jurors who rebel at the idea of imprisoning a person who used only the force needed to repel an attack could not legitimately acquit; and if they could not legitimately acquit, they might turn to illegitimate reasons. Such a risk violates the Constitution. *Patterson* and *Martin* are thus undone.

Before *Reddick* Illinois defined murder and manslaughter so that every person who commits "manslaughter" also commits "murder." The instructions told the jury to pick one of the offenses. Choosing among related offenses is a traditional task of juries; it happens when one crime is a lesser included offense of another and also when the elements of the offense overlap, or when the offenses are mutually exclusive. E.g., *United States v. Gaddis*, 424 U.S. 544, 96 S.Ct. 1023, 47 L.Ed.2d 222 (1976) (although bank

robbers physically possess the proceeds, the offenses of robbery and possession are mutually exclusive and judge or jury must elect between them). Often juries (and prosecutors, see *United States v. Batchelder*, 442 U.S. 114, 99 S.Ct. 2198, 60 L.Ed.2d 755 (1979)) must choose without a rule of priority among offenses. Judges tell the jurors to act on the basis of the evidence and arguments at trial. Jurors likely selected manslaughter for defendants with more sympathetic cases—for example, those who acted in self-defense.† None of this violates the Constitution. Yet the majority insists that it does, because of the possibility that the jurors will act for reasons outside the instructions and evidence. If that were the law—if the *possibility* of racial or other forbidden discrimination were treated the same as *proof* of discrimination—then all prosecutorial discretion would be unconstitutional, for the legislature does not prescribe the standards by which prosecutors decide who to charge, and with what crimes. But see *Wayte v. United States*, 470 U.S. 598, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985); *McCleskey v. Kemp*, 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987). All capital punishment also would be unconstitutional, for the Supreme Court has held that jurors must be told that they may elect between life and death on the basis of criteria they choose themselves. The jurors' ability to extend mercy cannot be limited. *Eddings v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982). Jurors might be more merciful to defendants of favored races or religions. Yet last Term one Justice stood alone in thinking that this is a constitutional problem. *Callins v. Collins*, — U.S. —, — — —, 114 S.Ct. 1127, 1135–36, 127 L.Ed.2d 435 (1994) (Blackmun, J., dissenting). The rest of the Justices believe that juries may possess an unfettered dis-

pensing power. If the Constitution *requires* this liberty in capital murder cases, how can it *forbid* an equally unguided option to mete out mercy in non-capital murder cases?

Instead of assuming that jurors will defy distasteful instructions—an assumption that is the keystone of the majority's analysis—we must proceed as if jurors follow the law as the judge articulates it. *Shannon v. United States*, — U.S. —, —, 114 S.Ct. 2419, 2427, 129 L.Ed.2d 459 (1994). Juries are told to disregard irrelevancies such as race, to base their decisions on the evidence at trial. The presumption that jurors follow their instructions "is not a bursting bubble, applicable only in the absence of better evidence. It is a rule of law—a description of the premises underlying the jury system, rather than a proposition about jurors' abilities and states of mind. See *Parker v. Randolph*, 442 U.S. 62, 73, 99 S.Ct. 2132, 2139, 60 L.Ed.2d 713 (1979) (plurality opinion) ('A critical assumption underlying [the] system [of trial by jury] is that juries will follow the instructions given them by the trial judge. Were this not so, it would be pointless for a trial court to instruct a jury, and even more pointless for an appellate court to reverse a criminal conviction because the jury was improperly instructed.'); *Jackson v. Denno*, 378 U.S. 368, 382 n. 10, 84 S.Ct. 1774, 1783 n. 10, 12 L.Ed.2d 908 (1964); *Opper v. United States*, 348 U.S. 84, 95, 75 S.Ct. 158, 165, 99 L.Ed. 101 (1954). Cf. *Sparf & Hansen v. United States*, 156 U.S. 51, 80, 15 S.Ct. 273, 284–85, 39 L.Ed. 343 (1895)." *Gacy v. Welborn*, 994 F.2d 305, 313 (7th Cir.1993).

*Falconer, Taylor,* and today's majority have advanced incompatible rationales for finding a constitutional problem in the old pattern jury instructions. While the explanation mutates, the conclusion remains. As

† The instructions defined murder in three "propositions" and manslaughter in four. The first two were identical. The third element of murder was "[t]hat the defendant was not justified in using the force which he used." The third and fourth propositions of manslaughter were "[t]hat when the defendant did so he believed that circumstances existed which would have justified killing [the victim]; and [t]hat the defendant's belief that such circumstances existed was unreasonable." So murder was defined as an intentional killing without actual justification, and man-

slaughter as an intentional killing coupled with an unreasonable belief that the act was justified. Many a trial centered around whether the accused had a belief that the application of force was necessary, and, if so, whether that belief was reasonable. Only a juror with a tin ear would fail to appreciate that a defendant who had an actual, but unreasonable, belief in the necessity of using force ought to be convicted of manslaughter, even though the instructions defined the same circumstances as murder to boot.

today's majority all but confesses, the real defect is not state judges' failure to follow the Constitution. It is that the instructions were incorrect as a matter of Illinois law.

> [This circuit's earlier] decisions essentially characterized the error as possibly depriving defendants of the benefit of the affirmative defense of manslaughter and, in so doing, resulting in murder convictions that, under Illinois law, should have been manslaughter convictions.

Majority op. at 1003. Exactly so. This is the short of it—and there is no long of it. "A federal court may not issue the writ on the basis of a perceived error of state law." *Pulley v. Harris,* 465 U.S. 37, 41, 104 S.Ct. 871, 874–75, 79 L.Ed.2d 29 (1984). See also, e.g., *Smith v. Phillips,* 455 U.S. 209, 221, 102 S.Ct. 940, 948, 71 L.Ed.2d 78 (1982); *Flowers,* 962 F.2d at 707–12 (concurring opinion). The Supreme Court's opinion in *Taylor* dispels any doubt that this principle applies to errors in jury instructions. "Outside of the capital context, we have never said that the possibility of a jury misapplying state law gives rise to a federal constitutional error. To the contrary, we have held that instructions that contain errors of state law may not form the basis for federal habeas relief." ── U.S. at ──, 113 S.Ct. at 2117.

That is not all the Court has to say about the cases in our *Falconer* sequence. *Falconer* itself tried to dodge the appearance of using the Constitution to enforce state law by contending that the defendant has a constitutional right to a reasonable chance of being acquitted on a theory of self-defense. The Supreme Court addressed that argument and held it incorrect, because it contradicts *Patterson* and *Martin.* ── U.S. at ──, 113 S.Ct. at 2117. (The Justices also observed that our opinion in *Taylor* had withdrawn this part of *Falconer's* rationale.) Then the Court turned to the *Taylor* panel's effort to lay a better foundation for *Falconer's* holding. Addressing the possibility that the instructions were too vague, the Justices said that the pattern jury instructions did not fall below the standard of *Boyde v. California,* 494 U.S. 370, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990), and like cases. See ── U.S. at ──, 113 S.Ct. at 2118. The Court undercut the substance of our panel's conclusion, not just

its power to support retroactive application; but I need not pursue the subject because *today's majority has done a 180° turn, finding the instructions clear rather than cloudy.*

After observing that all of this court's explanations are deficient, the Justices took up some additional arguments proposed by Taylor's lawyer—variations on the theme that the pattern instructions deprived him of the opportunity to present an effective defense. The Court might have responded that this would be a "new rule" that could not be employed on collateral review. Instead it wrote: "such an expansive reading of our cases would make a nullity of the rule reaffirmed in *Estelle v. McGuire, supra,* that instructional errors of state law generally may not form the basis for federal habeas relief." ── U.S. at ── ──, 113 S.Ct. at 2118–19. The majority in *Taylor* addressed one final effort to "constitutionalize" the error of Illinois law. Justice Blackmun, writing in dissent, marshaled several strands of constitutional doctrine in an effort to show that Taylor had been deprived of a fundamentally fair trial. The majority called the result "an unrecognizable constitutional stew." ── U.S. at ── n. 4, 113 S.Ct. at 2119 n. 4.

The majority dismisses these statements as dictum. The Supreme Court addressed in *Taylor* the question whether *Falconer* could be applied to cases whose direct appeals ended before June 29, 1990, when *Falconer* was decided. Retroactive application is possible only if *Falconer* was "dictated by precedent existing at the time the defendant's conviction became final." *Teague v. Lane,* 489 U.S. 288, 301, 109 S.Ct. 1060, 1070, 103 L.Ed.2d 334 (1989). See also *Caspari v. Bohlen,* ── U.S. ──, 114 S.Ct. 948, 127 L.Ed.2d 236 (1994). The Court held that *Falconer* was not so dictated. That could be true for either of two reasons: (a) its principle was not compelled by the Supreme Court's pre–1990 cases; (b) its principle was contradicted by the Supreme Court's pre–1990 cases. In *Taylor* the Court gave explanation (b). That it *could* have given an explanation of type (a) does not detract from the fact that it *did* give an explanation of type (b), which therefore is a holding. Compare *United States v. Martin Linen Supply Co.,* 430 U.S. 564, 568, 97 S.Ct. 1349, 1352–53,

51 L.Ed.2d 642 (1977), with *id.* at 576 n. 1, 97 S.Ct. at 1357 n. 1 (Stevens, J., concurring). Similarly, a court asked to give the defendant qualified immunity because the plaintiff's claim was not "clearly established" at the time the defendant acted may reply: "It is not clearly established even today." See *Siegert v. Gilley,* 500 U.S. 226, 232–33, 111 S.Ct. 1789, 1793–94, 114 L.Ed.2d 277 (1991). A reason of type (b) would not be dispositive today if, after June 1990, the Supreme Court had overruled the cases with which *Falconer* conflicted, but it hasn't. In *Taylor* the Court reiterated these cases and norms—and particularly the rule that collateral attack under § 2254 may not be used to correct errors of state law.

All of this today's majority approaches in a never-say-die spirit. If the earlier rationales have been swept away, find a new one. Perseverance is admirable, but there comes a time to recognize that we are an inferior court. "[I]t is not an adequate discharge of duty for courts to say: We see what you are driving at, but you have not said it, and therefore we shall go on as before." *Johnson v. United States,* 163 F. 30, 32 (1st Cir.1908) (Holmes, Circuit Justice). Let us give *Falconer* a decent burial. Because the instructions did not violate any of Thomas's constitutional rights, I join the majority in reversing the judgment issuing a writ of habeas corpus.